UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GLENNA L. MOBLEY-BUTCHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-0934-DFH-JMS |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social | ) | |
| Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Glenna L. Mobley-Butcher seeks judicial review of the
Commissioner of Social Security's final decision to deny disability insurance
benefits under the Social Security Act.   Acting for the Commissioner, an
Administrative Law Judge ("ALJ") determined that Ms. Mobley-Butcher's coronary
artery disease and orthostatic hypotension were severe impairments but that her
depression was not.  The ALJ concluded that Ms. Mobley-Butcher could no longer
perform her past jobs but remained capable of performing sedentary work and
therefore was not disabled.  On judicial review, Ms. Mobley-Butcher argues that
the ALJ erred in deeming her depression a non-severe impairment, erred in
finding that she could physically manage sedentary work, and erred by seeming

---

[1]Michael J. Astrue took office as Commissioner of the Social Security
Administration while Ms. Mobley-Butcher's case was pending before the court.
Commissioner Astrue is substituted as the defendant in this action pursuant to
Rule 25(d) of the Federal Rules of Civil Procedure.

to rely on testimony of a vocational expert who apparently did not actually testify in the hearing.  As explained below, the ALJ did not err with respect to the first two issues, and the error regarding the vocational expert's (non)testimony was harmless.  The court therefore affirms the denial of benefits.

*Background*

I.     *General and Medical Background*

Ms. Mobley-Butcher was born in 1962 and was 42 years old when the ALJ denied her application for disability insurance benefits.  R. 29.  She graduated from high school and worked as a waitress and most recently as a cashier and office clerk at a grocery store.  R. 477-78.  Ms. Mobley-Butcher worked at the grocery store until February 8, 2003, her alleged date of disability onset.  R. 480.

Ms. Mobley-Butcher has a history of heart disease.  She had at least one heart attack in her late thirties.  R. 200, 248.  In March 2002, she underwent angioplasty and had two stents placed in coronary arteries.  R. 248, 409.

On February 10, 2003, just after the onset of her alleged disability, Ms. Mobley-Butcher visited Dr. Sekhar Chandra, an internist specializing in cardiovascular disease.  She complained of dizziness and syncopal (fainting) episodes that she said had been occurring since December 2002 and happened when she bent over and even while she was driving.  R. 188.  Over the next several

months, she saw Dr. Chandra and other specialists for numerous diagnostic tests. She was diagnosed with orthostatic hypotension (low blood pressure) and coronary artery disease.  Dr. Chandra concluded that the continuing coronary artery disease was not amenable to further active intervention.   R. 175. Cardiologist Dr. Hornak said that if Ms. Mobley-Butcher had significant symptoms from the orthostatic hypotension, she should avoid driving and would face some limits on working.  R. 181.  Without recounting all the details of the medical history on these issues, the parties agree that these conditions left Ms. Mobley-Butcher unable to do work that required exertion above a sedentary level.  The parties disagree about whether she could do sedentary work.

At Dr. Chandra's suggestion, Ms. Mobley-Butcher began receiving counseling for depression at the Dunn Center on August 29, 2003.  R. 195.  The Dunn Center staff observed that her depression intensified with stressful circumstances.  R. 200.  Ms. Mobley-Butcher told the intake counselor that she had been battling depression for over six years, and that her doctors had prescribed medication to treat it.  R. 199.  The intake counselor noted functional impairment only in social settings, and did not indicate that Ms. Mobley-Butcher's depression was impairing her function physically or at work.  R. 201.  He estimated Ms. Mobley-Butcher's Global Assessment of Functioning ("GAF") at 50, R. 195, and noted that she was having suicidal ideations.[2]   R. 362.

---

[2]The GAF is a mental health rating that estimates a person's psychological, social, and occupational capacities on a hypothetical continuum of mental health-
(continued...)

Ms. Mobley-Butcher saw counselor Cynthia Schwomeyer, M.A., at the Dunn Center.  On September 3, 2003, Ms. Mobley-Butcher complained that her husband had kicked her out of their house in May and that he frequently told her she was "insane."  R. 208-09.  Schwomeyer determined that Ms. Mobley-Butcher was very depressed but not suicidal.  She classified Ms. Mobley-Butcher as "a woman who has had a lot of negative things happen to her throughout life – childhood and adult abuse, poor health, loss of job, two abusive marriages, mentally retarded daughter, abusive family of origin and no contact with them, no support except for one friend."  R. 355.

Ms. Mobley-Butcher's depressive symptoms improved over the next several months.  Although she was "more depressed since her last appointment" on September 29, 2003, R. 208, by October 8, 2003 she was "very positive and upbeat" and "talkative and insightful."  R. 206.  On October 22, 2003, Ms. Mobley-Butcher reported having a positive conversation with her husband and "appeared relaxed and comfortable with the therapeutic relationship."  *Id.*  Schwomeyer recommended that Ms. Mobley-Butcher work on developing "healthy boundaries" with her husband and friends and stated that increasing Ms. Mobley-Butcher's ego strength was a top priority.  R. 207.  Schwomeyer completed a treatment plan

---

[2](...continued)
illness.  It does not include impairment in functioning due to physical or environmental limitations.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000) ("DSM-IV-TR").  A GAF of 50 denotes serious symptoms, including suicidal ideation, or any serious impairment in social, occupational, or school functioning.  *Id.*  Fifty is the highest possible GAF in the "serious symptoms" decile.  *Id.*

review on November 18, 2003, in which she noted that Ms. Mobley-Butcher did

not have suicidal ideation and had set healthy boundaries with her husband.  R.

198.  Schwomeyer upgraded Ms. Mobley-Butcher's GAF to 60, and Schwomeyer's

supervisor noted that Ms. Mobley-Butcher had "improved with individual

counseling."  *Id.*[3]

On December 23, 2003, Schwomeyer reviewed Ms. Mobley-Butcher's file

and stated that she "was doing well in treatment but then started no-showing

since October 22, 2003."  R. 346.  Schwomeyer telephoned Ms. Mobley-Butcher

to see how she was doing.  Ms. Mobley-Butcher told her that  she was "doing well"

and was even planning to take a trip out of town.  *Id.*  Ms. Mobley-Butcher told

Schwomeyer that she had neither ideations of nor plans to commit suicide, and

she criticized the intake counselor's opinion that she was suicidal.  R. 347.

Schwomeyer expressed concern that Ms. Mobley-Butcher was "not doing as well

as she reported," particularly in light of her tendency to "put therapist on a

pedestal."  *Id.*

On February 26, 2004, Ms. Mobley-Butcher told Schwomeyer that she had

not been doing well since they had last met.  R. 341.  Ms. Mobley-Butcher said

she was feeling isolated, and Schwomeyer noted that she appeared "very sad and

---

[3]A GAF of 60 is appropriate when an individual has moderate symptoms, such as flat affect or occasional panic attacks, or when an individual experiences moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR at 34.  Sixty is the highest possible GAF in the "moderate symptoms" decile.  *Id.*

depressed" and looked tousled and "out of sorts."  R. 342.  Ms. Mobley-Butcher

stated that she felt "like she is in a dark hole and can't get out," but  Schwomeyer

concluded that Ms. Mobley-Butcher did not have suicidal ideations.  R. 342.  On

March 2, 2004, Schwomeyer's supervisor noted that Ms. Mobley-Butcher received

individual counseling sporadically and had "relapsed some."  R. 343.

On March 3, 2004, Ms. Mobley-Butcher was admitted to Reid Hospital in

Richmond, Indiana, after a friend found what appeared to be a suicide note.  R.

341-42.  Doctors diagnosed her with major depressive affective disorder, single

episode, moderate; neurotic depression; and anxiety state, unspecified.  R. 430,

167.  She was released the following day.  Doctors prescribed Trazodone and

Wellbutrin SR and discharged her in "stable and improved condition," with a GAF

of 60, into the care of a friend on March 4, 2004.  R. 169.

Ms. Mobley-Butcher resumed counseling with Schwomeyer on March 8,

2004.  R. 330.  She reported feeling much better than the previous week, and

Schwomeyer observed that she "appeared alert and more relaxed than last week."

R. 331.  Ms. Mobley-Butcher was "feeling very good" by March 11, 2004, and

reported that she had walked to the Dunn Center that day.  R. 330.

Ms. Mobley-Butcher saw Dr. Chandra on April 13, 2004 and reported that

she still felt depressed but no longer had thoughts of suicide.  R. 403.  She met

with Schwomeyer on May 27, 2004.  R. 296.  She reported feeling good about

herself, getting out of the house and walking, and maintaining boundaries with the (emotionally) unhealthy people in her life.  *Id.*  Schwomeyer observed that she looked "somewhat depressed," *id.*, but Dunn Center  nurse Dulemba found her to be "pleasant and cooperative," with "no evidence of psychosis."  R. 315. Schwomeyer completed a treatment plan review on June 1, 2004, in which she assigned Ms. Mobley-Butcher a GAF of 55.  R. 314.  Schwomeyer's supervisor also noted that Ms. Mobley-Butcher had stabilized since the hospitalization.  *Id.* Schwomeyer again assigned Ms. Mobley-Butcher a GAF of 55 on August 31, 2004. R. 313.  Schwomeyer's supervisor indicated that Ms. Mobley-Butcher was "non-compliant with all services" and noted that "follow-up" was being done.  *Id.*

Ms. Mobley-Butcher's final meeting with Schwomeyer, as far as the record indicates, was on September 2, 2004.  R. 296.  She reported that her depression had decreased again, and Schwomeyer observed that she was dressed nicely and had gained a little weight.  *Id.*  Schwomeyer concluded that Ms. Mobley-Butcher was "able to figure things out instead of falling into a depression and letting people control her."  R. 297.  Schwomeyer completed a brief assessment in which she noted that Ms. Mobley-Butcher had "made progress since [her] last assessment" and gave her a favorable mental status exam.  R. 308.  Schwomeyer's new treatment plan for Ms. Mobley-Butcher declared that her recurrent major depression was "in partial remission" and assessed her GAF at 60.  R. 310.

Ms. Mobley-Butcher also completed a questionnaire on September 2.  R. 298.  She indicated that she "never" had thoughts of ending her life, "rarely" felt hopeless about the future, and "rarely" felt afraid of driving, open spaces, or using public transportation.  *Id.*  She indicated that her chronic pain was in the past, as were her frequent headaches.  R. 300.  She reported current muscle problems but did not fill in any of the boxes in the "chronic fatigue" row.  *Id.*

II.   *Capacity Assessments*

Ms. Mobley-Butcher applied for disability insurance benefits on July 3, 2003.  R. 29.  Dr. Hornak submitted a brief assessment of Ms. Mobley-Butcher's functional capacity on August 18, 2003.  R. 219.  He opined that she "should not have any trouble with activities such as sitting, walking, lifting, carrying, handling objects, hearing, speaking, or traveling."  *Id.*  He noted, however, that she "may have trouble with prolonged standing which could lead to syncope because of orthostatic hypotension and this should be avoided."  *Id.*

State physician Dr. A. Ferenczy III provided a report of residual functional capacity dated September 9, 2003, which identified Ms. Mobley-Butcher's primary diagnosis as coronary artery disease, a secondary diagnosis as low blood pressure, and leg pain as an "other alleged impairment."  R. 221.  Dr. Ferenczy found that she could stand six hours in a workday and sit six hours in a workday, and that she should avoid exposure to hazards such as machinery and heights.  R. 225.  Dr. Ferenczy cited Ms. Mobley-Butcher's "good exercise tolerance," normal cervical

MRI, and treating doctors' opinions that she had "no disability due to coronary artery disease" and could perform full activity except "no prolonged standing" to establish the limitations.  R. 222-23.

Dr. Chandra completed a report on residual functional capacity on September 18, 2003.  R. 190-92.  He limited Ms. Mobley-Butcher to a maximum of three hours of sitting per day and a maximum of one hour each of standing and walking.  R. 190.  He opined that she could sit continuously for only one hour, and could stand and walk continuously for only half an hour each.  *Id.*  Dr. Chandra completely restricted Ms. Mobley-Butcher's capacity to grasp, push and pull, and use fine manipulation.  R. 191.  Like Dr. Ferenczy, he did not want Ms. Mobley-Butcher to be around unprotected heights, and he said her exposure to humidity and dust should be moderately limited.  *Id.*  Dr. Chandra said that Ms. Mobley-Butcher suffered from abnormal sensation, fatigue, and faintness, and concluded that these non-exertional limitations would have a "moderately severe" impact on her ability to perform job functions.  R. 191-92.  He  diagnosed Ms. Mobley-Butcher with severe orthostatic hypotension, coronary artery disease, and depression.  R. 192.

Ms. Mobley-Butcher completed a Reconsideration Disability Report on October 26, 2003.  R. 111-14.  She wrote that she could not drive, stand, or walk very far, and she asserted that Dr. Chandra had imposed restrictions on her since she filed the claim but did not elaborate on them.  R. 111.  She indicated that she

also suffered from depression, but claimed its onset date was "since I have filed for disability." *Id.* Since she had filed her initial claim, she wrote, she had slowed down, wanted to sleep all the time due to depression, and could no longer do things she had been able to do. R. 113.

Dr. Chandra submitted a letter to the Disability Determination Bureau on January 12, 2004. R. 171. He discussed Ms. Mobley-Butcher's orthostatic hypotension, coronary artery disease, and opined that her domestic and financial problems "put her in severe depression and extreme anxiety." *Id.* He concluded that Ms. Mobley-Butcher was "unable to hold any kind of job, mainly because of her severe dizziness and fainting spells." *Id.* In response to Ms. Mobley-Butcher's request for a "letter for [her] 'divorce attorney' stating she is disabled, not able to work, will never be able to return," R. 403, Dr. Chandra drafted a second letter on April 2, 2004. R. 401. He explained that Ms. Mobley-Butcher had "a tendency to faint or pass out when she is in the upright posture." *Id.* He wrote that Ms. Mobley-Butcher took multiple medications to control her problems, but that she still had to be "very careful regarding driving or prolonged standing or even sitting." *Id.* His ultimate assessment was that "she is totally disabled and not able to return to work and this disability is going to be permanent." *Id.*

State examiner Dr. Robert Fischer, Ph.D., H.S.P.P., gave Ms. Mobley-Butcher a mental status exam on April 20, 2004. R. 157. Ms. Mobley-Butcher told Dr. Fischer that she rated her depression as a seven on a scale of one to ten.

*Id.* She told him that she cried at least twice per week and had difficulty going to sleep at night. Dr. Fischer observed that Ms. Mobley-Butcher had a flat affect and a moderately to severely depressed mood. R. 158. He indicated that Ms. Mobley-Butcher was taking only two medications, the Wellbutrin and Trazodone prescribed by Reid Hospital's Dr. Esch in March. R. 157. Dr. Fischer diagnosed recurrent major depressive disorder, generalized anxiety, post-traumatic stress disorder, panic disorder without agoraphobia, and avoidant personality disorder. R. 159. He also noted hypotension and coronary artery disease, and wrote that "difficulties are expected with regard to . . . stressors in the environment." *Id.* He estimated that she had a GAF of 50. *Id.*

State examiner Dr. R. Klion, Ph.D., assessed Ms. Mobley-Butcher's mental residual functional capacity on May 28, 2004. R. 153-56. Dr. Klion also completed a Psychiatric Review Technique Form that day. R. 139-52. Dr. Klion concluded that Ms. Mobley-Butcher was not significantly limited in her understanding and memory, sustained concentration and persistence, or adaptation abilities. R. 153-54. Dr. Klion opined that her ability to ask simple questions or to request assistance was moderately limited. R. 154. Ms. Mobley-Butcher told Dr. Klion that her condition had improved somewhat since her hospitalization and that her medications were helping. R. 155. Dr. Klion noted that Ms. Mobley-Butcher was "fully independent within the home" and that her limitations were "restricted to physical capabilities." *Id.* Dr. Klion analyzed Ms. Mobley-Butcher under listing category 12.04, Affective Disorders. R. 139. Dr.

Klion checked the box next to "Depressive syndrome characterized by at least four of the following," but checked only three items:  sleep disturbance, feelings of guilt or worthlessness, and thoughts of suicide.  R. 142.  Dr. Klion noted that Ms. Mobley-Butcher had experienced "one or two" episodes of decompensation, but determined that her "depressive syndrome" only mildly restricted her activities of daily living and her concentration, persistence, or pace.  R. 149.  Dr. Klion opined that Ms. Mobley-Bucher's social functionings were moderately impaired.  *Id.*

III.   *Testimony at the Hearing*

Ms. Mobley-Butcher testified before ALJ James R. Norris on January 13, 2005.  R. 476-506.  The ALJ asked Ms. Mobley-Butcher to explain the difficulties she experienced when she was on her feet.  R. 479.  She told him that when she was "up and about, my blood pressure, I guess, drops . . . and I get dizzy.  And then the room starts spinning around.  And I break out in sweats.  And along with that comes being nauseated."  *Id.*  The ALJ asked Ms. Mobley-Butcher if she had any other health problems that she thought would interfere with her ability to work.  She replied, "No, unless you would want to say my nerves plays [sic] a big part with all of this, too."  *Id.*  The ALJ began to ask Ms. Mobley-Butcher about "psychological issues" and how long she had had them, but Ms. Mobley-Butcher's attorney requested a short recess to "talk to her about one thing."  *Id.*

When the hearing resumed, the ALJ shifted gears and asked Ms. Mobley-Butcher to describe what she had been doing since her employment ended.  R.

480.   Ms. Mobley-Butcher testified that she tried to "find little hobbies," like crocheting, doing puzzles, and reading novels.  *Id.*  She also told the ALJ that she liked to watch television and that she liked to cook when she was not dizzy.  *Id.*  The ALJ concluded his questioning of Ms. Mobley-Butcher by returning to the issue of Ms. Mobley-Butcher's ability to stand and move around. R. 481.  Ms. Mobley-Butcher explained that there was "no pattern" to her dizzy spells,  and that on some days she could "go a couple of hours" standing  and on others  she got dizzy and had to sit down.  *Id.*  She also testified that she became "real shaky, trembling" and "real sweaty" if she stayed on her feet too long.  *Id.*

While being questioned by her attorney, Ms. Mobley-Butcher testified that on average, she had about three to four spells daily lasting between fifteen and thirty minutes, and that to feel better she had to stop and sit down or lie down. R. 483-84.  She testified that it could take between twenty minutes and an hour for her to recover fully.  R. 484.  Ms. Mobley-Butcher explained that her friend drove her around, R. 485, because she followed Dr. Hornak's suggestion that she not drive.  R. 478.  She testified that depression had always been "a big part along – I mean just with everything in general in life."  R. 485.  She said that when she got sick in February 2003, "it started getting worse to where I got to the point to where I was ready to commit suicide."  *Id.*  She concluded by telling the ALJ that "everything stopped for me" once she stopped working; "life stopped in general I mean, no working, no driving."  R. 486.

Two medical experts testified at the hearing: psychologist David G. Jarmon, Ph.D., and Dr. Paul A. Boyce, M.D., an internist with specialties in endocrinology and diabetes mellitus.[4]   Dr. Jarmon confirmed that the record contained the formal diagnosis of a psychological impairment, major depressive disorder, recurrent.  R. 486.  Dr. Jarmon testified that "the depression is definitely there and kind of goes up and down and may well be reactive in some ways to the physical problems that she's experiencing during those periods of time."  R. 488.  Dr. Jarmon stated that the only "real evaluation" of limited function or dysfunction Ms. Mobley-Butcher might have been experiencing as a result of her depression was the May 1, 2004 mental status exam conducted by Dr. Fischer.  *Id.*  Dr. Jarmon testified that, based on that exam, Ms. Mobley-Butcher had "logical and reasonable" thought processes and was "functional in that capacity."  *Id.*  He testified that "the problems are not consistently severe throughout the record," but qualified his opinion by saying that "episodes might interfere at times with her ability to work . . . but not on a consistent basis."  R. 488-89.  He concluded that Ms. Mobley-Butcher's depression would not preclude her from performing unskilled work that the ALJ described as "very routine and doesn't require adapting to various circumstances or anything like that," R. 489, but conceded that "a person with a GAF of 50 would probably have significant difficulty focusing on work responsibility."  R. 491.

---

[4]The cover page and introductory paragraph of the hearing transcript state that vocational expert Michael Blankenship also appeared at the hearing.  R. 474, 476.  The transcript contains no further references to Blankenship and does not indicate that he gave any testimony.

Dr. Boyce discussed the diagnosis of orthostatic hypotension and said it was "pretty well documented in the record that her problems primarily are with changes in position." R. 496. Dr. Boyce was familiar with the condition because "it's a fairly common condition in diabetic neuropathy," one of his specialties. R. 495. He explained that orthostatic hypotension "is generally associated with changing from either the supine or a recumbent position to a sitting or from a sitting to a standing position and the blood pressure falls." *Id.* Dr. Boyce read several specific blood pressure measurements from Ms. Mobley-Butcher's medical charts into the record. R. 493-94. He noted that Ms. Mobley-Butcher's doctors did not perform a standard test for orthostatic hypotension, the "tilt table," but said that he still thought the diagnosis was correct. R. 494-95.

Dr. Boyce discussed Ms. Mobley-Butcher's residual functional capacity in detail. He said Ms. Mobley-Butcher's condition precluded her from standing on her feet a lot, thus precluding her past relevant work, R. 496, and he specifically rejected Dr. Hornak's opinion that Ms. Mobley-Butcher could tolerate a lot of walking. R. 497. Dr. Boyce agreed with Dr. Chandra's assessments that Ms. Mobley-Butcher could sit continuously for an hour at a time and stand and walk for half an hour at a time. R. 498. He disagreed, however, with Dr. Chandra's opinion that Ms. Mobley-Butcher could sit for a total of only three hours per day. *Id.* "There's no limitation on sitting with orthostatic hypotension," he stated. *Id.* He explained he would generally restrict people with recurrent episodes to sitting or standing for "no more than two hours and their walking to no more than two

hours maximum in the day." *Id.*  He opined that if Ms. Mobley-Butcher could stand for half an hour at a time, she "ought to be able to stand for three or four hours total." *Id.*

Dr. Boyce explained that "you have to almost treat [orthostatic hypotension] like it's a seizure disorder," and thus concluded that Ms. Mobley-Butcher could not work in jobs that required climbing or being around unprotected heights.  R. 499-500.   He said she could extend her arms, flex her neck, bend and rotate her trunk, push and pull arm or leg controls, squat, kneel, and crawl occasionally. *Id.*  Dr. Boyce clarified Dr. Chandra's moderate restriction on heavy machinery, noting that "where it's heavy equipment, putting your hands in equipment, you probably shouldn't do that at all," but "if you're picking something up off an assembly line that's, you know, a conveyor belt that's going by, that should not be an issue."  R. 500.   He also testified that Ms. Mobley-Butcher's ability to use her hands for simple grasping, pushing, pulling, or fine manipulation was not restricted by anything in the medical record.  R. 499.   Dr. Boyce explained that Ms. Mobley-Butcher should avoid moderate exposure to "marked changes" in temperature and humidity because "exposure to extreme humidity and heat may exacerbate this orthostatic component that these people have."  R. 500.

Dr. Boyce disagreed with Dr. Chandra's prohibition on driving.  R. 500. "There's no reason to say you can't drive.  You just have to be very careful."  *Id.* He also discounted the state agency's assessment of residual functional capacity,

explaining that it permitted too much walking and said Ms. Mobley-Butcher would be able to perform postural limitations frequently rather than occasionally, as he had recommended.  R. 501.  He did not agree with the state agency's minimal restrictions on hazards and lack of restrictions on environmental conditions.  R. 502.  Dr. Boyce reiterated that "the change in position is the real problem" and noted that there might be a "little second component to her dizziness that she experiences maybe some dizziness when she's sitting."  *Id.*  He opined that Ms. Mobley-Butcher's dizziness while sitting had "nothing to do with orthostasis," *id.*, and refused to agree with the attorney's statement "that for some patients that have this condition, they can have these episodes at times other than when they're changing positions, getting up, et cetera."  R. 505.

## Procedural History

ALJ James R. Norris issued a decision denying Ms. Mobley-Butcher's application for disability insurance benefits.  Because the Appeals Council denied further review of the ALJ's decision, the ALJ's decision is treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  Ms. Mobley-Butcher now seeks judicial review of the denial of her application.  The court has jurisdiction over the matter under 42 U.S.C. § 405(g).

*The Statutory Framework for Determining Disability*

To qualify for benefits, Ms. Mobley-Butcher would have to demonstrate that she was unable to perform any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). Ms. Mobley-Butcher was disabled only if her impairments were of such severity that she was unable to engage in work she had done previously and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work existed in her immediate area, or whether she would be hired if she applied for work. 42 U.S.C. § 423(d)(2)(A).

This eligibility standard is a stringent one; the Social Security Act neither contemplates degrees of disability nor allows for an award based on a partial disability. *Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1989). Thus, even claimants who suffer substantial impairments are not automatically entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

The implementing regulations for the Act provide a five-step process to use in evaluating disability. The steps are:

(1)     Has the claimant engaged in substantial gainful activity?  If so, she was not disabled.

(2)     If not, did the claimant have an impairment or combination of impairments that are severe?  If not, she was not disabled.

(3)     If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)     If not, could the claimant do her past relevant work?  If so, she was not disabled.

(5)     If not, could the claimant perform other work existing in significant numbers in the national economy given her residual functional capacity, age, education, and experience?  If so, then she was not disabled.  If not, she was disabled.

See generally  20 C.F.R. § 404.1520.   When this test is applied, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Applying the five-step process, the ALJ found that Ms. Mobley-Butcher satisfied step one because she had not engaged in substantial gainful activity since her alleged onset date of disability.  R. 34.   At step two, the ALJ found that Ms. Mobley-Butcher had severe impairments of orthostatic hypotension and coronary artery disease, but he did not find that her depression was a severe impairment.  *Id.*  At step three, the ALJ found that Ms. Mobley-Butcher failed to demonstrate that her impairments or combination of impairments met or equaled one of the qualifying impairments listed in Social Security regulations.  *Id.*  At step four, the ALJ found that Ms. Mobley-Butcher could not perform her past relevant work.  *Id.*  At step five, the ALJ found that Ms. Mobley-Butcher retained the ability

-19-

to perform sedentary work with no exposure to hazards.  *Id.*  The ALJ referred to Medical-Vocational Rule 201.28 (in "the Grid") and concluded that Ms. Mobley-Butcher, a "younger individual" with a high school education and no transferable work skills, was not disabled.

## Standard of Review

The Social Security Act limits the scope of judicial review. If an ALJ's decision is both supported by substantial evidence and based on the proper legal criteria, a reviewing court must uphold it.  42 U.S.C. § 405(g); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), quoting *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence supports the ALJ's decision, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reassessing the facts or the credibility of witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  The court must examine the evidence that favors the claimant as well as the evidence that supports the ALJ's conclusion.  *Zurawski*, 245 F.3d at 888.  Where conflicting evidence allows reasonable minds to differ as

to whether a claimant is entitled to benefits, the court must defer to the ALJ's resolution of the conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). Also, the ALJ must explain the decision with "enough detail and clarity to permit meaningful appellate review." *Briscoe*, 425 F.3d at 351. Although the ALJ need not provide a full written evaluation of every piece of testimony and evidence, *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005), a remand may be required if the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

### Discussion

Ms. Mobley-Butcher raises three arguments. First, she contends that the ALJ erred in finding that her depression was not a severe impairment. Second, she contends that the ALJ improperly evaluated the opinions of her treating physician and the medical expert in finding that she was capable of a wide range of sedentary work. Third, she makes the related assertion that the ALJ improperly found her capable of performing the full range of sedentary work, relying at least in part on testimony from a vocational expert who did not actually testify in this case.

I.     *Depression as a Severe Impairment*

Ms. Mobley-Butcher argues that the ALJ failed to reconcile the evidence for and against a finding of severe mental impairment and omitted significant pieces of information necessary to understand the entire medical picture.  Pl. Br. 4.  Under the Social Security Act, a "severe" impairment is one that "significantly limits" a claimant's "physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 404.1521; see also § 404.1520a(c)(2) (providing that when evaluating whether a claimant's mental impairment is severe, the Commissioner "will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis").  The ALJ found at step two that Ms. Mobley-Butcher's coronary ailments constituted "severe" impairments but that her depression did not.

An ALJ may not select and discuss only the evidence that favors his ultimate conclusion.  An ALJ also may not ignore an entire line of evidence that is contrary to the ruling.  See *Golembiewski v. Barnhart*, 322 F.3d 912, 917-18 (7th Cir. 2003) (vacating and remanding because ALJ improperly ignored three lines of evidence supporting plaintiff's claim).  However, the ALJ is not required to provide an in-depth analysis of every piece of evidence.  *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).  The ALJ must minimally articulate reasons for rejecting or accepting specific evidence of disability so that a reviewing court can trace the path of the ALJ's reasoning.  *Id.* at 307.  The question is not whether the ALJ

discussed every piece of evidence, but whether the ALJ built an accurate and logical bridge between the evidence in the record and the result. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

The ALJ devoted about one page of his six-page opinion to a discussion of Ms. Mobley-Butcher's mental capacity. R. 33-34. He discussed evidence spanning the full record, noting positive findings ("she has no difficulty getting along with anyone, including her former coworkers") as well as negative ("suicidal ideations"). R. 33-34. His reasoned analysis incorporated findings from throughout the record and provided the required articulation of his reasoning. He built a sufficient bridge between the body of evidence and his conclusion. *See Steele*, 290 F.3d at 941.

Ms. Mobley-Butcher argues that the ALJ should have addressed more specifically the instances in which she was assigned a GAF score of 50. Pl. Br. 5. She emphasizes that a GAF of 50 reflects "serious impairment in social, occupational, or school functioning." *Id.* Although the ALJ did not specifically mention Ms. Mobley-Butcher's GAF scores or discuss every diagnosis, he was not required to do so. He did not omit significant significant pieces of information necessary to understand the entire medical picture, nor did he fail to "reconcile the evidence for and against a severe mental impairment," as Ms. Mobley-Butcher asserts. The ALJ did not fail to consider an entire line of evidence. *See Diaz*, 55 F.3d at 307.

The ALJ's analysis incorporated findings from throughout the record and met the minimal level of articulation required. He considered in sufficient detail the conflicting evidence concerning Ms. Mobley-Butcher's ability to function in a variety of contexts, including her ability to perform day-to-day activities, to deal with other people, and to concentrate on a task. R. 33-34. The ALJ recognized the evidence of the overnight hospitalization in March 2004, but could reasonably treat that event as a brief episode that did not show long-term impairment of Ms. Mobley-Butcher's ability to work. He noted the "pattern of alleging suicidal ideations and then improving with treatment, including hospitalization." R. 33. Because the ALJ built a sufficiently accurate and logical bridge between these considerations and the conclusion that Ms. Mobley-Butcher's depression was not a severe impairment, the ALJ's opinion is adequate and may not be disturbed on these grounds. *Steele*, 290 F.3d at 941.

## II.   *Residual Functional Capacity*

### A.   *Weighing Opinions*

Ms. Mobley-Butcher contends that the ALJ improperly evaluated the opinions of her treating physician and of the medical expert who testified at her hearing when formulating her residual functional capacity. She argues that the ALJ "refused to weigh Dr. Chandra's opinion," Pl. Br. 6, and "did not consider whether [Dr. Chandra's and Dr. Boyce's opinions] were supported by the record.

Pl. Br. 7.  The basic issue here is whether plaintiff was physically capable of handling sedentary work.

Dr. Chandra assessed Ms. Mobley-Butcher's residual functional capacity on September 18, 2003.  R. 190-92.  He limited Ms. Mobley-Butcher to a maximum of three hours of sitting per day and a maximum of one hour each of standing and walking.  R. 190.  He opined that she could sit continuously for only one hour, and could stand and walk continuously for only half an hour each.  *Id.*  These restrictions would, if valid, prevent full-time work and would render Ms. Mobley-Butcher disabled under the Social Security Act.  Dr. Chandra also completely restricted Ms. Mobley-Butcher's capacity to grasp, push and pull, and use fine manipulation.  He did not explain these findings, and they are not supported by any other evidence.  R. 191.  Dr. Chandra did not want her to be around unprotected heights and said her exposure to other environmental features like humidity and dust should be moderately limited.  *Id.*  Dr. Chandra said that Ms. Mobley-Butcher suffered from "abnormal sensation," "fatigue," and "faintness," and he concluded that these non-exertional limitations would have a "moderately severe" impact on her ability to perform job functions.  R. 191-92.  He concluded in January 2004 that Ms. Mobley-Butcher was "unable to hold any kind of job, mainly because of her severe dizziness and fainting spells."  R. 171.

ALJs are required to consider all legally relevant evidence, and it is their responsibility to determine how much credence to afford particular pieces of

evidence. *Diaz*, 55 F.3d at 309. The ALJ is not required to accept uncritically all conclusions reached by anyone with a medical degree, but must evaluate the evidence presented and at least "minimally articulate" why evidence supporting claimants is not sufficiently persuasive to find disability. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). When treating and consulting physicians present conflicting opinions, the ALJ may decide whom to believe, provided that substantial evidence supports his decision. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The law does not require that the opinion of a treating physician always be accepted over that of a consulting physician; the relative merits of both must be considered. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). An ALJ need not defer to a treating physician's determination of a claimant's residual functional capacity, since that ultimate question is for the ALJ to decide. 20 C.F.R. § 404.1527(e)(2).

The ALJ did not refuse to weigh the opinion of Dr. Chandra, Ms. Mobley-Butcher's treating physician. On the contrary, the ALJ discussed Dr. Chandra's opinion in some detail. The ALJ explained that Dr. Chandra concluded that Ms. Mobley-Butcher had a "'tendency to faint or pass out' when in the 'upright posture,'" and noted that this assessment mirrored the testimony given by Dr. Boyce during the hearing. R. 31. The ALJ explained that he credited Dr. Boyce's and Dr. Hornak's opinions instead of Dr. Chandra's much more restrictive opinion. The ALJ noted some internal inconsistencies in the information that Dr. Chandra provided. See R. 31. Although the ALJ's explanation at page 33 of the

record is not as clear as it could be, he noted a lack of explanation from Dr. Chandra for a number of the limitations he found, such as inability to use her hand or feet for controls and other purposes.  Those limits do not seem to be supported by any other exam results or findings.

The ALJ's written opinion seems to express some indignation about the fact that Dr. Chandra had said plaintiff was unable to sit more than three hours in a workday.  The court does not see the ALJ's point.  It is true that the ultimate questions of residual functional capacity and disability are left to the ALJ.  See Social Security Ruling 96-5p.  However, doctors and other evaluators are supposed to provide, and are expressly invited to provide, their opinions about the claimant's ability to sit, stand, walk, etc., a certain number of hours during the workday.  Dr. Chandra's opinion did not stray beyond his proper role. Nevertheless, the ALJ still had reasonable grounds for rejecting Dr. Chandra's opinion as unduly restrictive based on the entire body of evidence.

In evaluating Ms. Mobley-Butcher's residual functional capacity, the ALJ cited a multitude of medical evidence, including Ms. Mobley-Butcher's subjective complaints, her physicians' treatment notes, and the results of objective medical tests like EKGs, MRIs, and stress tests.  R. 31-32.  The ALJ specifically considered Dr. Boyce's testimony about Ms. Mobley-Butcher's ability to perform sedentary work in light of the lack of evidence in the record about problems with her arms, hands, or fingers.  R. 32.  He also compared Dr. Chandra's and Dr. Hornak's

opinions, addressing both physicians' treatment notes.  R. 31.  The ALJ made
numerous and explicit citations to the record.  He addressed inconsistencies and
advanced a reasonable interpretation of the evidence.  This court must defer to his
judgment.  42 U.S.C. § 405(g); *Briscoe*, 425 F.3d at 351 (7th Cir. 2005).

B.   *Capacity for Sedentary Work*

Ms. Mobley-Butcher argues that the ALJ's finding on residual functional
capacity that she was capable of performing the full range of sedentary work failed
to accommodate fully her limitations.  She also points out that the ALJ referred
to the testimony of a vocational expert who was not present at her hearing.

The ALJ determined that Ms. Mobley-Butcher had the functional capacity
to perform "unskilled sedentary work with no exposure to hazards."  R. 34.  He
clarified his assessment by stating that her capacity was "for a sit-down job" that
"requires no prolonged standing."  *Id.*  The ALJ found that Ms. Mobley-Butcher at
age 42 was a "younger individual" with a high school education and no
transferable work skills.  He consulted Medical-Vocational ("Grid") Rule 201.28,
which directed a finding of not disabled for a person with her characteristics.

The Grid is a chart that classifies a claimant as disabled or not disabled
based on the claimant's physical capacity, age, education, and work experience.
*Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987).  If a claimant is found to have
only exertional limitations (sitting, standing, walking, lifting, carrying, pushing,

and pulling) and the individual's physical capacity, age, education, and work experience coincide with a Grid rule, the ALJ may directly apply the rule to determine whether a claimant is disabled.  20 C.F.R. § 404.1569a(b); *Walker*, 834 F.2d at 640.  An ALJ may not rely on the Grid to direct a finding of not disabled when the claimant suffers from significant non-exertional limitations, such as pain or difficulty tolerating physical features of work settings.  20 C.F.R. § 404.1569a(d); see *Fast v. Barnhart*, 397 F.3d 468, 470-71 (7th Cir. 2005); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001); *Herron v. Shalala*, 19 F.3d 329, 336 (7th Cir. 1994).  However, to "uphold the ALJ's finding that the grids may be used in a given case, we require only that there be reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available."  *Walker*, 834 F.2d at 641, quoting *Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir. 1986).

Here, the ALJ acknowledged that Ms. Mobley-Butcher's capacity was affected by  both exertional and non-exertional limitations.  The ALJ concluded that she could perform *specific* sedentary work:  sit-down jobs that would not expose her to hazards.  R. 34.  The ALJ explained that vocational expert Blankenship had testified that "sedentary work involves no hazards," *id.*, which permitted the ALJ to take administrative notice that there was a significant number of jobs that Ms. Mobley-Butcher could perform despite her limitations. *E.g.*, SSR 96-9p.  The ALJ then consulted the Grid corresponding to Ms. Mobley-

Butcher's physical capacity, age, education, and work experience to determine that she was not disabled.  R. 34.

The  problem is that no vocational expert appears to have testified at Ms. Mobley-Butcher's hearing.  The record indicates that Michael Blankenship was present and was invited to give testimony.  R. 79, 474, 476.  But no testimony was taken from Blankenship in this case, although he testifies frequently in Social Security cases in this area.  If he attended this particular hearing, he remained silent.

The substantive issue here is whether the non-exertional limitations for Ms. Mobley-Butcher – that she not be exposed to hazards on the job – would undermine reliance on the Grid by limiting the availability of jobs.  Testimony that never occurred cannot constitute "reliable evidence of some kind that would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available."  See *Walker*, 834 F.2d at 641.  In this case, however, the ALJ's error in citing testimony that was not in the record was harmless.  The same information is available in a source that cannot seriously be questioned for these purposes.  Social Security Ruling 96-9p discusses at length the effect that various non-exertional limitations have on the sedentary occupational base.  It states in relevant part:

> In general, few occupations in the unskilled sedentary occupational base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards.  The 'hazards' defined in the

> [Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles] are considered unusual in unskilled sedentary work. They include:  moving mechanical parts of equipment, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals.  *Even a need to avoid all exposure to these conditions would not, by itself, result in a significant erosion of the occupational base.*

SSR 96-9p; 61 Fed. Reg. 34478, 34483 (1996) (emphasis added).  If the court were to remand because of the erroneous citation to Blankenship, the ALJ would need only to cite SSR 96-9p to support his reasoning on this issue.  The non-exertional limits on Ms. Mobley-Butcher's ability to do sedentary work do not undermine the ALJ's reliance on the Grid to deny her claim for benefits.

*Conclusion*

For the foregoing reasons, the court affirms the ALJ's denial of benefits. Final judgment shall be entered consistent with this entry.

So ordered.

Date: September 6, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Charles D. Hankey
charleshankey@hankeylawoffice.com